1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL GONZALES,

        Plaintiff,

    v.

UBER TECHNOLOGIES, INC., et al.,

        Defendants.

Case No. 17-cv-02264-JSC

**ORDER RE MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Re: Dkt. No. 38

       Plaintiff Michael Gonzales brings this action on his own behalf and as a putative class action for Lyft drivers whose electronic communications and whereabouts were allegedly intercepted, accessed, monitored, and/or transmitted by Defendants Uber Technologies, Inc., Uber USA LLC, and Raiser-CA (together, "Uber").  Now pending before the Court is Defendants' motion to dismiss Plaintiff's First Amended Complaint ("FAC").  (Dkt. No. 38.)  Having carefully reviewed the parties' briefing and having had the benefit of oral argument on January 11, 2018, the Court GRANTS Defendants' motion with leave to amend.

**FIRST AMENDED COMPLAINT ALLEGATIONS**

**A.    The Lyft App**

       "Lyft provides technology that operates similar to a taxi company's dispatch system." (Dkt. No. 34 ¶ 3.)  "A rider requests a ride using a software application on his or her phone (the 'Lyft App')."  (*Id*.)  After a rider logs on to the Lyft App, the App sends a Hypertext Transfer Protocol ("HTTP") request to Lyft's servers.  (*Id*. ¶ 65.)  The HTTP request contains the passenger's Lyft ID and GPS coordinates.  (*Id*. ¶ 66.)  Lyft's servers respond to the Lyft App's request with a list of nearby drivers who are logged in and who have affirmatively indicated they are available for work; the list includes the drivers' Lyft IDs and GPS coordinates.  (*Id*. ¶ 67.)  The

list is transmitted to riders through Lyft's servers.  (*Id*.) "The locations of nearby Lyft drivers are displayed to the rider as dots on a map, along with the estimated price and wait time for arrival once the ride request is submitted." (*Id*. at ¶ 3.)

"Drivers also use the Lyft App." (*Id*. ¶ 4.) "When a driver is ready to accept work, the driver swipes a switch on the Lyft App, directing the Lyft App to continuously transmit the driver's geolocation data and his or her willingness to accept work to servers maintained by Lyft." (*Id*.) Lyft drivers used the Lyft App to communicate with Lyft servers by transmitting and receiving "packets" of information.  (*Id*. ¶ 55.) "A packet is analogous to a physical letter mailed from one address to the other, and the protocol used to transmit the packet is analogous to the physical envelope that holds the letter." (*Id*.) "While traditional envelopes use physical postal addresses,  . packets use computer Internet Protocol (IP) addresses." (*Id*. ¶ 70.) The digital letter transmitted from the driver to Lyft's servers in response to a rider's HTTP request includes (1) the driver's unique identifier, (2) the driver's precise geolocation data, (3)  the driver's affirmation that the driver is available to provide rides for Lyft users, and (4) an estimated price for the rider's requested ride.  (*Id*. ¶ 72.) Lyft, acting as the driver's agent, forwards a driver's geolocation and willingness to drive to those requesting a ride.  (*Id*. ¶ 4.)

## B.    Uber's Hell Spyware

Uber offers technology that competes with the Lyft App and operates in the same geographic regions as Lyft.  (*Id*. ¶¶ 5, 6.) Some drivers perform transport services through the two platforms simultaneously.  (*Id*. at ¶ 6.) Lyft's and Uber's systems store the location of every driver, whether on duty or off duty, every few seconds.  (*Id*. ¶¶ 87, 88.) "[N]either Uber nor Lyft ever delete the geolocation data they collect from drivers, at least in part because they consider it valuable to their respective businesses." (*Id*. ¶ 90.)

Starting in 2014 or earlier and continuing into 2016, Uber secretly used 'Hell spyware' to access servers and smartphones owned and operated by Plaintiff, Class Members, and Lyft.  (*Id*. ¶ 52.) The "spyware extracted information from Lyft by posing as Lyft customers in search of rides." (*Id*. ¶ 7.) These fake Lyft riders sent forged requests to Lyft's servers.  (*Id*.) When Lyft's servers received "a request from a forged rider account, they believed that the ride requests were

2

coming from actual Lyft riders, not the Hell spyware." (*Id.* ¶ 77.)  As a result, Lyft's servers transmitted a response to Uber's fake Lyft requesters containing the IDs, on duty status, pricing, and exact locations of nearby Lyft drivers.  (*Id.*)  "The data transmitted was provided by Lyft drivers and was only intended to be delivered to actual nearby Lyft riders."  (*Id.*)

Uber used the fraudulently received geolocation data and driver identifiers "to create grid-like detection nets over cities including San Francisco, Los Angeles, and New York."  (*Id.* ¶ 80.)  For instance, a forged rider account would transmit a request indicating that the rider was at the Philip Burton Federal Building with specific GPS coordinates.  (*Id.*)  In response, Lyft's servers "would transmit back information for all nearby Lyft drivers."  (*Id.*)  The Hell spyware would simultaneously also send another set of requests indicating that a different fake Lyft rider was a few blocks north on O'Farrell Street with specific geolocation data .  (*Id.*)  This process was repeated with a large number of fake Lyft accounts, "allowing Uber to obtain complete geographic coverage of entire metropolitan areas, and the exact locations of all Lyft drivers and other information." (*Id.*)  "Uber repeated this process millions of times using the Hell spyware from 2014 through 2016."  (*Id.* ¶ 8.)

Uber used the data collected in conjunction with other databases "to learn personal details about Lyft drivers including, but not limited to, the drivers' full names, their home addresses, when and where they typically work each day and for how many hours, and where they take breaks."  (*Id.* ¶ 83.)  "Uber was able to use this data to determine the identities of the drivers' rider customers."  (*Id.*)

"Uber combined the data harvested by Hell [spyware] with Uber's internal records, including historical location data, to identify Lyft drivers who also worked for Uber."  (*Id.* ¶ 9.)  "Uber used the information gleaned from Hell to direct more frequent and more profitable trips to Uber drivers who also used the Lyft App."  (*Id.* ¶ 101.)  "By inundating these drivers [with] Uber rides, Uber was able to discourage drivers from accepting work on the Lyft platform, reducing the effective supply of available Lyft drivers."  (*Id.* ¶ 101.)  "With the supply of Lyft drivers reduced, Lyft customers faced longer wait times." (*Id.* ¶ 102.)  As a result, Lyft riders would cancel the ride requested with Lyft and request a new ride from Uber, and Lyft drivers experienced decreased

United States District Court
Northern District of California

3

1   earnings.  (*Id.* ¶¶ 9, 102.)  "Over time, this would reduce the effectiveness of the Lyft App, thus

2   harming drivers such as Plaintiff and absent Class Members."  (*Id.* ¶ 102.)

3                                    **PROCEDURAL HISTORY**

4          Plaintiff filed an initial complaint seeking injunctive relief and damages based on four

5   claims: (1) Federal Wiretap Act as amended by the Electronic Communications Privacy Act (the

6   "ECPA"), (2) the California Invasion of Privacy Act ("CIPA"), (3) the California Unfair

7   Competition Law (the "UCL"), and (4) common law invasion of privacy.  (Dkt. No. 1.)

8   Defendants moved to dismiss all four claims.  (Dkt. No. 17.)   The Court granted Defendants'

9   motion with leave to amend.  (Dkt. Nos. 27.)

10         Plaintiff then filed a First Amended Complaint seeking the same relief under the same

11  causes of action with two additional claims: (1) the Federal Stored Communication Act (the

12  "SCA") and (2) the California Computer Fraud and Abuse Act (the "CFAA").  (Dkt. No. 34.)

13  Thereafter, Defendants filed the now pending motion to dismiss.  (Dkt. No. 38.)

14                                      **DISCUSSION**

15  **I.     Federal Claims**

16         **A.     The Wiretap Act**

17         The Federal Wiretap Act makes it unlawful to "intentionally intercept [ ] ... any wire, oral,

18  or electronic communication."  18 U.S.C. § 2511(1)(a). "Intercept" "means the aural or other

19  acquisition of the contents of any wire, electronic, or oral communication through the use of any

20  electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  Plaintiff's Wiretap Act claim fails

21  because he has not alleged and cannot allege that Uber "intercepted" the "contents" of a

22  communication.

23         1.     *Contents of a Communication*

24         Plaintiff alleges that when he activates the Lyft App he sends Lyft his unique Lyft driver

25  identification, his precise geolocation data, his affirmation that he is willing to provide rides to

26  drivers, and an estimated price for the ride (presumably only when there is a rider request).  (FAC

27  ¶ 72.)  With the possible exception of the estimated price, this information does not qualify as the

28  "contents" of a communication within the meaning of the Wiretap Act.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Act defines "contents" as "includ[ing] any information concerning the substance,

2    purport, or meaning of that communication."  18 U.S.C. § 2510(8).  "'[C]ontents' refers to the

3    intended message conveyed by the communication, and does not include record information

4    regarding the characteristics of the message that is generated in the course of the communication."

5    *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).  Record information includes the

6    "name," "address," and "subscriber number or identity" of a subscriber or customer.  *Id.* (citing 18

7    U.S.C. § 2702(c)(2)).  For example, data about a telephone call, including the number from which

8    it was made, the time it was made, the number called, and the length of the call does not fall

9    within the Wiretap Act because it is not the content of the communication, it is data about the

10   communication.  *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009).  Similarly, an

11   individual's Facebook ID and the url of the webpage the individual was viewing are not the

12   contents of a communication when that information is automatically generated when the

13   individual clicks an app or game icon.  *In re Zynga Privacy Litig.*, 703 F.3d at 1107-09. It follows,

14   then, that Plaintiff's IP address and unique Lyft driver ID are not the contents of a communication

15   within the meaning of the Act.

16       Plaintiff's geolocation data is also record information rather than the content of a

17   communication; the data is automatically generated when Plaintiff activates the Lyft App.  (FAC ¶

18   4.)  *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) ("the

19   allegedly intercepted electronic communications are simply users' geolocation data.  This data is

20   generated automatically, rather than through the intent of the user, and therefore does not

21   constitute 'content' susceptible to interception"); *In re Carrier IQ, Inc*., 78 F.Supp.3d 1051, 1082

22   (N.D. Cal. 2015) ("[t]he geographic location of a mobile device at any given time has likewise

23   been deemed to be non-content information."); *Cousineau v. Microsoft Corp.*, 922 F.Supp.2d

24   1116, 1127 (W.D. Wash. Jun. 22, 2012) ("contents" as used in the Wiretap Act is not broad

25   enough to encompass geolocation data)  While a text message stating "I am at 6th and Broadway"

26   would constitute content, the automatic generation of geolocation data is record information.

27       Plaintiff insists that the geolocation data is content because Uber used it to "(1) locate

28   drivers, (2) identify drivers who also drove for Uber, (3) identify which drivers were available for

new rides, (4) track prices that Lyft would offer for trips, and (5) identify how many cars were available to pick up riders at a particular location." (Dkt. No. 41 at 27.) Assuming as the Court must that these allegations are true, none of that information involves a communication from the Lyft driver, let alone the content of such a communication. Further, nothing in the Wiretap Act suggests that *how* an intercepting party uses a communication determines whether the communication involves "content" within the Act's meaning.

The "content" analysis may be different as to pricing information; however, there are no allegations in the FAC that suggest that Plaintiff *intended* to communicate pricing information. *See In re Zynga Privacy Litig.*, 750 F.3d at 1106 ("Congress intended the word 'contents' to mean a person's intended message to another"). Pricing is discussed twice: paragraphs 3 and 72. Paragraph 72 states: "Lyft drivers who are ready to work send digital letters to Lyft. Each letter has a number of components that are directly analogous to a physical letter" including "an estimated price for the ride." Simply because Plaintiff sends a "letter" to Lyft that includes an estimated price does not mean the Lyft driver *intends* to communicate that price. There are no allegations that the Lyft driver had the ability to set the price of a Lyft ride or how price is determined or even whether the Lyft driver is aware of the price communicated to Lyft's servers. Indeed, paragraph 3 supports an inference that Lyft sets the price or that it is automatically generated by the Lyft App. When a Lyft rider opens the App, "[t]he locations of nearby Lyft drivers are displayed to the rider as dots on a map." (FAC ¶ 3.) In other words, the Lyft rider first sees the cars in her area that are willing to provide rides. Then, after the Lyft rider submits her request, she can see "the estimated price and wait time for arrival." (*Id.*) Accordingly, the FAC does not allege that the driver intended to communicate an estimated price. Thus, it is not the content of a communication by Plaintiff.

At oral argument Plaintiff also argued that the content of the driver's message is "the fact they're available to work." (Dkt. No. 48 at 7:5-7.) In other words, Plaintiff contends that it can be inferred from the driver's toggling on of the App that the driver is available to work. That is one inference that can be drawn; another is that the driver toggled on whether he wants to work or not. The only communication, then, is that the driver toggled on—a communication more akin to

record information than content.  In *In re Zynga*, for example, the Ninth Circuit distinguished between the address of a Facebook webpage a user is viewing and a Google search URL that not only shows that a user is using the search engine but also the specific *search terms* the user communicated to Google.  750 F.3d at 1108.  The court explained:

> Under some circumstances a user's request to a search engine for specific information could constitute a communication such that divulging a URL containing that search term to a third party could amount to disclosure of the contents of a communication. But the referer header information at issue here includes only basic identification and address information, not a search term or similar communication made by the user, and therefore does not constitute the contents of a communication.

*Id*.  Under Plaintiff's interpretation of "content," the information as to the webpage the user was viewing is "content" because it could be inferred that the user was communicating he wanted to view that webpage, just as, according to Plaintiff, from the act of toggling on it can be inferred that driver is available to accept rides.  But *In re Zynga* rejects such a broad reading of content.  In other words, simply opening a webpage or mobile application is not a communication with content.

Accordingly, Plaintiff has not alleged facts sufficient to satisfy the "contents" prong of the Wiretap Act.

### 2.    *Intercept*

Plaintiff also does not allege facts that plausibly suggest that Uber "intercepted" any of *his* communications.  *See* 18 U.S.C. § 2520(a) (any person whose wire, oral or electronic communications were intercepted may bring a civil action).  The Wiretap Act defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  *Id.* § 2510(4).  The term "acquisition" is not defined in the statute, but the Ninth Circuit, looking at the term's "ordinary meaning," has defined it as the "act of acquiring, or coming into possession of."  *United States v. Smith,* 155 F.3d 1051, 1055 n.7 (9th Cir. 1998).  Further, to be "intercepted" it must have been "acquired during transmission, not while it is in electronic storage."  *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 878 (9th Cir. 2002).  A narrow definition of "intercept" which requires

7

1    acquisition contemporaneous with transmission is most "consistent with the ordinary meaning of

2    'intercept,' which is 'to stop, seize, or interrupt in progress or course before arrival.'" *Konop*, 302

3    F.3d at 878.

4        Drawing all reasonable inferences in Plaintiff's favor, the FAC does not allege that Uber

5    intercepted a communication from Plaintiff.  Plaintiff alleges that his driver ID and geolocation

6    information were sent to Lyft's servers.  (FAC ¶ 56.)  Lyft then took the information it received

7    from Plaintiff and other nearby drivers and sent it to Uber (pretending to be an actual Lyft

8    customer).  (FAC ¶ 67.)  Thus, the communication Uber acquired is a communication from Lyft

9    and not Plaintiff and therefore Lyft did not intercept Plaintiff's communications.

10       Plaintiff's new "sniffer" allegations do not change the outcome.  That Uber used network

11   analyzers to decode TCP packets sent from Lyft's servers to the App is insufficient because

12   Plaintiff has not pled the identity of the person using the Lyft App or that Uber was intercepting

13   TCP packets or other communications that were sent by Plaintiff.

14       Plaintiff alleges that Uber posed as fake Lyft riders to determine the location of Lyft

15   drivers.  These fake accounts sent messages to Lyft, which sent a message back to Uber with

16   nearby Lyft driver locations.  The communications occurred directly between Lyft and Uber

17   posing as Lyft riders; there was no contemporaneous transmission between Plaintiff and Lyft that

18   was *stopped* or *interrupted* by Uber.  *See Konop*, 302 F.3d at 878.  That Uber was pretending to be

19   a legitimate Lyft rider is of no moment; Plaintiff has still not alleged the interception of a

20   communication from *Plaintiff* to a third party.

21       Plaintiff's reliance on *United States v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010),

22   is unpersuasive.  In *Szymuszkiewicz*, the plaintiff set up a rule in Microsoft Outlook to direct his

23   boss's emails to his account.  The Seventh Circuit held that the servers in question make copies of

24   the boss's messages "within a second of each message's arrival and assembly" with no more than

25   an eyeblink in between each message, and therefore the defendant's acquisition of the emails

26   constituted contemporaneous interception.  Here, unlike *Szymuszkiewicz*, there were no messages

27   between existing Lyft drivers and Lyft riders that were copied contemporaneously by Uber;

28   instead, as alleged, the acquired messages traveled directly and only between Lyft and Uber acting

United States District Court
Northern District of California

8

1   as a Lyft rider.

2        Accordingly, Plaintiff has not plausibly alleged an "interception" under the Wiretap Act.

3                                              ***

4        In light of Plaintiff's failure to plausibly plead that Uber intercepted the content of a

5   communication from Plaintiff, the Court declines to consider Uber's other arguments.  The federal

6   Wiretap Act is dismissed with leave to amend, but only to the extent Plaintiff can allege consistent

7   with Rule 11 that Uber intercepted the content of a communication from Plaintiff.

8        **B.      Stored Communications Act ("SCA")**

9        Uber also argues that Plaintiff fails to state a claim under the Stored Communications Act.

10  "The Stored Communications Act provides a cause of action against anyone who 'intentionally

11  accesses without authorization a facility through which an electronic communication service is

12  provided ... and thereby obtains, alters, or prevents authorized access to a wire or electronic

13  communication while it is in electronic storage.'"  *Theofel v. Farley-Jones*, 359 F.3d 1066, 1072

14  (9th Cir. 2004) (citing 18 U.S.C. §§ 2701(a)(1)).  The SCA defines "electronic storage" as "(A)

15  any temporary, intermediate storage of a wire or electronic communication incidental to the

16  electronic transmission thereof; and (B) any storage of such communication by an electronic

17  communication service for the purpose of backup protection of such communication."  18 U.S.C.

18  § 2510(17)(A), (B).  "[S]ubsection (A) covers e-mail messages stored on an ISP's server pending

19  delivery to the recipient."  *Theofel*, 359 F.3d at 1075.  "By its plain terms, subsection (B) applies

20  to backup storage regardless of whether it is intermediate or post-transmission."  *Id*. at 1072-1073.

21       Plaintiff's SCA claim fails because he has not alleged facts that plausibly suggest that the

22  communications were in "electronic storage"; that is, that the communications were temporary or

23  were in storage for the purpose of back-up protection.  Plaintiff alleges that Lyft's and Uber's

24  systems store the location of every driver, whether on duty or off duty, every few seconds and that

25  neither Uber nor Lyft ever delete the geolocation data they collect from drivers.  (FAC ¶¶ 87, 88,

26  90.)  Given this information is never deleted, the communications at issue are not stored

27  temporarily and therefore do not fall under section (A).  Nor does section (B) apply: Plaintiff has

28  not pled that the communications Lyft stores on its servers is backup information.  Indeed,

United States District Court
Northern District of California

9

1    Plaintiff admits that he has not made any such allegation, but he asserts that he cannot do so

2    without discovery and thus should be excused.  The case he relies on to support his argument, *In*

3    *re Intuit Privacy Litigation*, 138 F. Supp. 2d 1272 (C.D. Cal. 2001), was decided before the United

4    States Supreme Court's decisions in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v.*

5    *Iqbal*, 556 U.S. 602 (2009), and thus is not persuasive.

6    　　　Uber also argues that Plaintiff has not plausibly alleged "unauthorized access" to a stored

7    communication.  It contends that because Plaintiff alleges that Uber (while pretending to be a

8    legitimate Lyft rider) *requested* the information that Lyft then provided, Uber cannot have

9    engaged in unauthorized access.  The Court is unpersuaded.  Plaintiff alleges that Uber violated

10   Lyft's terms of service and falsely posed as a Lyft rider to gain access to that information; Uber

11   does not explain how such access is authorized.  Indeed, it appears directly analogous to "the

12   busybody who get permission to come inside by posing as meter reader" and is thus trespassing.

13   *Thoefel*, 359 F.3d at 1073.

14   　　　Uber's lament that Plaintiff has not shown that Lyft's servers qualify as a "facility" under

15   the Stored Communications Act reverses the burden of proof.  On Uber's motion to dismiss it is

16   its burden to show that the servers cannot possibly qualify as a "facility."  It has not met that

17   burden.

18   　　　Nonetheless, as Plaintiff has not alleged facts that plausibly suggest that the

19   communications Uber allegedly accessed without authorization are "backups," the Stored

20   Communications Act claim must be dismissed.  The dismissal will be with leave to amend to

21   allege facts that show that Uber accessed communications in "electronic storage."

22   **II.      State Claims**

23   　　　**A.      California Invasion of Privacy Act ("CIPA")**

24   　　　The CIPA is California's anti-wiretapping and anti-eavesdropping statute that prohibits

25   unauthorized interceptions of communications in order "to protect the right of privacy."  Cal.

26   Penal Code § 630.  "The analysis for a violation of CIPA is the same as that under the federal

27   Wiretap Act."  *See NovelPoster v. Javitch Canfield Group*, 140 F.Supp.3d 938, 954 (N.D. Cal.

28   Aug. 4, 2014) (citing cases).  The FAC alleges violations of two CIPA sections, 632 and 637.7.

United States District Court
Northern District of California

10

1    Uber argues Plaintiff's CIPA claim fails because (1) Plaintiff "fails to allege Uber 'eavesdropped'

2    on any 'confidential communications' (as required by Section 632)" and (2) Plaintiff consented to

3    his smartphone tracking his location, triggering the exception to a Section 637.7 violation.  (Dkt.

4    No. 38 at 19:11-14.)

5              1.      *Section 632*

6              California Penal Code section 632 makes it unlawful to "intentionally and without the

7    consent of all parties to a confidential communication, use[] an electronic amplifying or recording

8    device to eavesdrop upon or record the confidential communication." "California courts interpret

9    'eavesdrop,' as used in section 632, to refer to a third party secretly listening to a conversation

10   between two other parties." *Thomasson v. GC Services Ltd. P'ship*, 321 Fed. App'x 557 (9th Cir.

11   2008) (citing *Ribas v. Clark*, 38 Cal.3d 355, 363 (1985); *Rogers v. Ulrich*, 52 Cal.App.3d 894, 899

12   (1975)); *see also Flanaghan v. Flanaghan*, 27 Cal.4th 766, 775 (2002) (Penal Code section 632

13   prohibits "unconsented to eavesdropping or recording of conversations").  Plaintiff contends Uber

14   collected data from messages Lyft sent to Uber, acting as a Lyft rider.  Plaintiff has not alleged

15   that Uber "eavesdropped" on communications between Lyft drivers and legitimate Lyft riders or

16   between Lyft drivers and Lyft.  Accordingly, Plaintiff's Section 632 CIPA claim fails.

17             Plaintiff's only argument as to why the allegations here somehow constitute eavesdropping

18   is to claim that the Ninth Circuit's decision in *Thomasson* is not good law in light of *Kight v.*

19   *Cashcall, Inc.*, 200 Cal.App.4th 1377 (2012).  But this argument makes no sense.  *Kight* did

20   disagree with *Thomasson's* conclusion that a company could not eavesdrop on its own employee's

21   conversations with customers because the employee and employer were considered the same

22   party.  *Id.* at 1394.  But *Kight* did not hold that section 632 prohibits something other than

23   eavesdropping or recording a communication between two other people.  To the contrary,

24   consistent with *Thomasson* and the other California cases cited above, *Kight* held that section 632

25   "expressly prohibits surreptitious monitoring without the consent of 'all parties' to the

26   conversation and specifically imposes liability on a corporation for improper eavesdropping."  *Id.*

27   at 1393.  Plaintiff has not alleged any such conduct; accordingly, the section 632 claim fails.

28

United States District Court
Northern District of California

1

                2.      *Section 637.7*

2      Section 637.7 prohibits the "use [of] an electronic tracking device to determine the location

3  or movement of a person," but there is no violation if the "owner, lessor, or lessee of a vehicle has

4  consented to the use of the electronic tracking device with respect to that vehicle." *Id*. § 637.7(a)–

5  (b).  Plaintiff alleges that he consented to the use of his smartphone as a tracking device with

6  respect to whatever vehicle he is using when he signed up to be a Lyft driver. (Dkt. No. 34 ¶ 93.)

7      Plaintiff argues his 637.7 claim cannot be dismissed because consent is an affirmative

8  defense.  However, the language regarding consent is found in the statute itself, under Section

9  637.7(b):

10             (a) No person or entity in this state shall use an electronic tracking device to
               determine the location or movement of a person.

11

12             (b) This section shall not apply when the registered owner, lessor, or lessee
               of a vehicle has consented to the use of the electronic tracking device with
               respect to that vehicle.

13

14  In any event, even if it is an affirmative defense on which Uber bears the ultimate burden of proof,

15  Uber has met that burden based on Plaintiff's own allegations.  (Dkt. No. 34 ¶ 93.)

16      Plaintiff next urges that no valid consent was "transferred" to Uber. The statute's plain

17  language, however, does not require consent be given to the person doing the tracking; instead, it

18  says that the statute does not apply if the vehicle's owner, lessor or leseee "consented to the use of

19  the electronic tracking device with respect to that vehicle."  Cal. Penal Code § 637(b).  The only

20  case Plaintiff cites to support his argument, *People v. Barnes*, 216 Cal.App.4th 1508 (2013), does

21  not address the issue here: consent to one party and not to a third party (Uber) under Section

22  637.7.  Instead, *Barnes* concerned the victim of a theft who consented to Sprint and police officers

23  to track her phone to apprehend the person who stole the victim's phone.  216 Cal.App.4th at

24  1511-1512.  The *Barnes* court concluded there is no Fourth Amendment violation when the

25  information generated by the GPS, with the owner's consent, is only a part of the objective

26  reasons leading to the decision to detain.  *Id*., 216 Cal.App.4th at 1519.  *Barnes* is thus inapposite.

27      The plain language of Section 637.7 states that the statute does not apply when the owner

28  of a vehicle consents to the use of the tracking device with respect to the same vehicle.  The statute

United States District Court
Northern District of California

does not distinguish to whom consent is given and this Court is unaware of any authority that holds consent is limited to particular parties.  Plaintiff consented to the tracking of his vehicle through his cellphone when he signed up to be a Lyft driver.  Accordingly, Plaintiff's Section 637.7 claim fails and shall be dismissed without leave to amend.

**B.      Computer Data Access and Fraud Act ("CDAFA")**

The California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, "expand[s] the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."  *Id.* § 502(a).  Plaintiff alleges Uber violated subdivisions (c)(1)–(3), (5), and (7).  In particular, parroting the language of the subsections, Plaintiff conclusorily alleges that Uber:

- knowingly accesses and without permission used data, or a computer, or a computer system, or a computer network, in order to wrongfully control or obtain money, property, or data, contrary to Cal. Penal Code § 502(c)(1)

- knowingly accessed and without permission took, copied, or made use of data from a computer, computer system, or computer network, or took or copied and supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network, contrary to Cal. Penal Code § 502(c)(2)

- knowingly [and without permission] used or caused to be used computer services, contrary to Cal. Penal Code § 502(c)(3)

- knowingly and without permission disrupted or caused the disruption of computer services or denied or caused the denial of computer services to an authorized user of a computer, computer system, or computer network, contrary to Cal. Penal Code § 502(c)(5)

- knowingly and without permission provided or assisted in providing the a means of accessing a computer, computer system, or computer network in violation of Cal. Penal Code § 502, contrary to Cal. Penal Code § 502(c)(7).

(Dkt. No. 34 ¶¶ 125-129.)

These boilerplates allegations do not survive Rule 8. Did Uber use data, a computer or a computer system to wrongfully obtain money?  How did Uber disrupt or deny the use of computer services?  What was it that it did without permission?  Neither Uber nor the Court should have to guess how Plaintiff contends these subsections were violated.   Further, the Act provides that "the

1   owner or lessee of the computer, computer system, computer network, computer program, or data

2   who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)

3   may bring a civil action against the violator for compensatory damages and injunctive relief or

4   other equitable relief." Cal. Penal Code § 502(e)(1).  Thus, Plaintiff must allege that Uber

5   accessed *Plaintiff's* computer, computer system, etc.  He has not done so.

6        Accordingly, Plaintiff' claim under the California Comprehensive Computer Data Access

7   and Fraud Act is dismissed with leave to amend to the extent Plaintiff can allege facts that

8   plausibly suggest Uber violated a particular subsection of the Act.

9        **C.     Invasion of Privacy**

10       The California Constitution creates a privacy right that protects individuals from

11  the invasion of their privacy by private parties. *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th

12  307, 327 (1997).  To state a claim under the California constitutional right to privacy, a plaintiff

13  must allege three elements: (1) a legally protected privacy interest; (2) a reasonable expectation

14  of privacy under the circumstances; and (3) conduct by the defendant that amounts to a

15  serious invasion of the protected privacy interest.  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal.4th

16  1, 35–37 (1994).  "Actionable invasions of privacy must be sufficiently serious in their nature,

17  scope, and actual or potential impact to constitute an egregious breach of the social norms

18  underlying the privacy right." *Id.* at 37.  The California Supreme Court recently held that while

19  less sensitive than medical history or financial data, home contact information is generally

20  considered private.  *Williams v. Superior Court*, 3 Cal.5th 531, 554 (2017).

21       Plaintiff alleges that Uber used the data collected from Lyft in conjunction with other

22  databases to learn personal details about Lyft drivers including, but not limited to, drivers' full

23  names, when and where they typically work, where they take breaks, and the drivers' home

24  addresses.  (Dkt. No. 34 ¶ 83, 92.)

25       Plaintiff has sufficiently pled a protected privacy interest as to home addresses, *see*

26  *Williams*, 3 Cal.5th at 554, and arguably precise geolocation data. *See U.S. v. Jones*, 565 U.S.

27  400, 411 (concluding the GPS tracking device of a vehicle, and the subsequent use of that device

28  to monitor the vehicle's movements on public streets, was a search within the meaning of the

United States District Court
Northern District of California

14

1    Fourth Amendment requiring a warrant).  Plaintiff, however, offers no authority to support his

2    argument that the other information Uber allegedly obtained is generally considered private - Lyft

3    ID number, working as a Lyft driver, and full names.  The Court concludes it is not.

4         The second element, a reasonable expectation of privacy under the circumstances, is not

5    met.  "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based

6    and widely accepted community norms."  *Hill,* 7 Cal.4th at 37.  The decision "must take into

7    account any 'accepted community norms,' advance notice to [Plaintiff] ..., and whether [Plaintiff]

8    had the opportunity to consent to or reject the very thing that constitutes the invasion." *TBG Ins.*

9    *Servs. Corp. v. Superior Court,* 96 Cal.App.4th 443 (2002).  The plaintiff in an invasion of privacy

10   action must have conducted himself or herself in a manner consistent with an actual expectation of

11   privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the

12   invasive actions of defendant.  *Hill,* 7 Cal.4th at 26.  The "community norms" aspect of the

13   "reasonable expectation of privacy" element means that "the protection afforded to the plaintiff's

14   interest in his privacy must be relative to the customs of the time and place, to the occupation of

15   the plaintiff and to the habits of his neighbors and fellow citizens."  *TBG Ins. Servs. Corp.,* 96

16   Cal.App.4th at 450.

17        Plaintiff consented to the sharing of his geolocation data with perfect strangers (Lyft

18   riders); thus, under the circumstances he did not have a reasonable expectation of privacy in such

19   information.  (Dkt. No. 34 ¶ 93.)

20        Plaintiff may have toggled on from home and thus, since Uber was allegedly tracking the

21   location of Lyft drivers, Uber could have determined Plaintiff's home address.  (Dkt. No. 34 ¶ 92.)

22   However, under the circumstances the drivers did not have a reasonable expectation of privacy in

23   their home location. Most Lyft users, both drivers and riders, can expect that their home addresses

24   will be shared with other users on the platform when using the Lyft App.  As such, users cannot

25   reasonably expect that this information will remain private.

26        Plaintiff argues his consent was limited to Lyft and therefore Plaintiff had a reasonable

27   expectation that only Lyft would have access to his information.  However, "the case law suggests

28   that in determining whether a plaintiff has satisfied the elements of the claim, a plaintiff's lack of

United States District Court
Northern District of California

15

consent does not matter so much as the nature of the information in which he or she alleges a privacy interest." *See In re Yahoo*, 7 F.Supp.3d at 1040-1041; *see also In re iPhone Application Litig.,* 844 F.Supp.2d at 1063 ("[e]ven assuming this information was transmitted without Plaintiffs' knowledge and consent*,* a fact disputed by Defendants, such disclosure [of information including device identifier number, personal data, and geolocation information] does not constitute an egregious breach of social norms").

Nor is the third element, a serious invasion, met. "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." *Hill*, 7 Cal. at 37. "The California Constitution sets a high bar for establishing an invasion of privacy claim." *In re Yahoo Mail Litigation*, 7 F.Supp.3d 1016, 1038 (N.D. Cal. Aug. 12, 2014) (citing *Belluomini v. Citigroup, Inc.,* No. CV 13–01743 CRB, 2013 WL 3855589, at *6 (N.D. Cal. July 24, 2013)). "Even disclosure of very personal information has not been deemed an 'egregious breach of social norms' sufficient to establish a constitutional right to privacy." *Id.* (citing *In re iPhone Application Litig.,* 844 F.Supp.2d at 1063) (holding that the disclosure to third parties of unique device identifier number, personal data, and geolocation information did not constitute an egregious breach of privacy sufficient to prove a serious invasion of a privacy interest); *Ruiz v. Gap, Inc.,* 540 F.Supp.2d 1121, 1127–28 (N.D. Cal. Mar. 24, 2008), *aff'd*, 380 Fed.Appx. 689 (9th Cir. 2010 (unpublished) (holding that the theft of a retail store's laptop containing personal information, including the social security numbers, of job applicants did not constitute an egregious breach of privacy and therefore was not sufficient to state a claim).

In *Folgelstrom v. Lamps Plus, Inc.,* 195 Cal.App.4th 986, 992 (2011), the "supposed invasion of privacy essentially consisted of [defendant] obtaining plaintiff's address without his knowledge or permission, and using it to mail him coupons and other advertisements." The court concluded the defendant's actions were not an egregious breach of social norms but were instead routine commercial behavior. *Id.* Here, similar to *Folgelstrom*, Uber allegedly obtained Plaintiff's name and home address; however, there is no allegation as to what Uber did, if anything, with this

1   information.  Indeed, it appears that Plaintiff is alleging only that Uber could have obtained his

2   home address, not that it in fact intentionally did so.  Without more allegations as to what, if

3   anything, Uber did with this information, Plaintiff has not plausibly alleged a serious invasion of

4   privacy.

5          Plaintiff's reference to his allegation that Uber obtained the names of Lyft's customers is

6   puzzling as he does not explain how that translates into a serious invasion of *Plaintiff's* right to

7   privacy.

8          Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's constitutional

9   invasion of privacy claim with leave to amend.

10         **D.       Unfair Competition Law**

11         California's Unfair Competition Law ("UCL") prohibits, and provides civil remedies for,

12   "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice."  Cal.

13   Bus. & Prof. Code § 17200 et seq.  Its purpose "is to protect both consumers and competitors by

14   promoting fair competition in commercial markets for goods and services."  *Kasky v. Nike, Inc.*,

15   27 Cal.4th 939, 949 (2002).

16         Private parties can sue under the UCL only if, as a result of unfair competition, they have:

17   (1) suffered an injury in fact, (2) lost money or property, and (3) the economic injury was a "result

18   of" the unfair competition.  *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322, 326 (2011);

19   Cal. Bus. & Prof. Code § 17204.  The "lost money or property" requirement means plaintiff "must

20   demonstrate some form of economic injury such as surrendering more or acquiring less in an

21   transaction, having a present or future property interest diminished, being deprived of money or

22   property, or entering into a transaction costing money or property that was unnecessary.  *Id*. at

23   323.  "At the pleading stage, general factual allegations of injury resulting from the defendant's

24   conduct may suffice."  *Id.* at 27.

25         Plaintiff alleges that by encouraging drivers to use the Uber platform exclusively, and not

26   also drive for Lyft, that reduced the supply of Lyft drivers thereby increasing wait times and

27   causing Lyft drivers to experience decreased earnings; in particular, the longer wait time would

28   cause a passenger to cancel the Lyft request and request a new ride from Uber.  (FAC ¶ 9, 101,

United States District Court
Northern District of California

1    102.)  These factual allegations, which the Court must accept as true, are sufficient to satisfy the

2    lost money or property requirement of UCL standing.

3          Plaintiff also urges that Uber's unauthorized "interception of communications constitutes

4    cognizable injury."  (Dkt. No. 41 at 34:10-11.)  However, the sharing of names, user IDs, location

5    and other personal information does not constitute lost money or property for UCL standing

6    purposes.  *See Campbell v. Facebook*, 77 F.Supp.3d 836, 849 (N.D. Cal. Dec 23, 2014)

7    (concluding the courts "have consistently rejected" a broad interpretation of "money or property"

8    to include personal information); *Archer v. United Rentals, Inc.*, 195 Cal.App.4th 807, 816 (2011)

9    (holding that an invasion of a right to privacy through the collection of private information is not

10   "lost money or property" conferring UCL standing).  Nonetheless, he has sufficiently alleged that

11   he lost revenue as a result of Uber's programs to decrease the supply of Lyft drivers.  Whether

12   Plaintiff will be able to prove that allegation is a question for another day.

13         Accordingly, Plaintiff has alleged standing to bring a UCL claim.  The Court is

14   unpersuaded that at this stage of the litigation Plaintiff cannot pursue equitable relief.

15                                          **CONCLUSION**

16         For the reasons described above Uber's motion to dismiss is GRANTED as to all claims

17   except the UCL claim.  Plaintiff is granted leave to file an amended complaint as to all claims

18   except the CIPA section 637.7 claim as amendment as to that claim would be futile.  Plaintiff is

19   not given leave to add any new claims; leave is only to correct, if possible, deficiencies in the

20   allegations of the claims already pled.  The second amended complaint shall be by May 18, 2018.

21   Uber's request for judicial notice of Lyft's terms of service is GRANTED given the document is

22   referenced in the FAC and its accuracy is not reasonably questioned.  *See* Fed. R. Evid. 201(b)(2).

23   Plaintiff's request for judicial notice is DENIED given the Jacobs letter from the *Waymo* litigation

24   is not discussed in the FAC nor relevant to this matter.

25   //

26   //

27   //

28   //

*United States District Court*
*Northern District of California*

18

1   //

2            This Order disposes of Docket No. 38.

3            **IT IS SO ORDERED.**

4   Dated: April 18, 2018

                                                    JACQUELINE SCOTT CORLEY
                                                    United States Magistrate Judge